Perry S. Clegg (USB 7831)
pclegg@kba.law
**KUNZLER BEAN & ADAMSON, PC**
50 W. Broadway, Suite 1000
Salt Lake City, UT 84101
Tel.: (801) 994-4646
Fax: (801) 758-7436

*Attorneys for Plaintiff,*
Modern Font Applications LLC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| MODERN FONT APPLICATIONS LLC, a Utah limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>PETSMART, INC., a Delaware corporation,<br><br>Defendant(s). | **AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND**<br><br>Case No. 2:19-cv-00613-BSJ<br><br>Judge Bruce S. Jenkins |

Plaintiff Modern Font Applications LLC ("MFA" or "Plaintiff"), for its amended complaint against Defendant PETSMART, INC. ("Defendant") alleges as follows:

**INTRODUCTION**

1. MFA instituted the present action against Defendant for infringement of United States Patent No. 9,886,421 ("the '421 patent" or "patent in suit"), entitled "Allowing Operating System Access to Non-Standard Fonts in a Network Document" to prevent the unfair and unlawful exploitation of its intellectual property. A copy of the '421 patent is attached hereto as **Exhibit A**. The disclosure of the '421 patent is incorporated herein by reference. MFA seeks an

injunction against Defendant's unlawful conduct, as well as an award of damages and attorneys' fees as provided by law.

2. The patent in suit discloses apparatuses and methods for delivery and rendering of non-standard or external fonts within a network system.

3. Robert G. Adamson, III is the inventor of the patent in suit.

4. Mr. Adamson has been a computer scientist since at least 1971. In 1981, Mr. Adamson founded Software Generation Technology Corp. and wrote one of the first fully interpretive languages for IBM mainframe computers.

5. Mr. Adamson later founded Nostradamus Inc. and wrote Instant Replay, one of the first multimedia tools for personal computers. This tool was used by thousands of large companies, including Intel, Microsoft, and Novel. Mr. Adamson also wrote utilities including Noblink and Hardrunner, both of which received Editor's Choice awards from PC Magazine.

6. Mr. Adamson later wrote MediaForge, one of the first multimedia authoring tools for the Windows operating system. MediaForge was sold to Strata and was a "Best of Comdex" finalist in development software in 1994. Over 50 million MediaForge runtimes were distributed.

7. Mr. Adamson has been an active developer of application authoring technology since the 1990s.

8. In 2001, Mr. Adamson founded a technology company to develop software. That company currently offers software development services utilizing font delivery technology.

9. Mr. Adamson later founded a technology company that incorporates font delivery technology with digital photo editing. Mr. Adamson currently works with this company to offer a commercial software development kit (SDK) for authoring digital photo applications including font delivery capabilities.

10. Mr. Adamson's font delivery technologies predate the field of mobile applications for

smart phones by several years. Mr. Adamson filed the priority application for the patent in suit in 2001.

11. Upon information and belief, in 2003, development of the Android operating system began.

12. Upon information and belief, in 2007, the iPhone and iOS were introduced to the public.

13. Upon information and belief, in 2007, the Android operating system was introduced to the public.

14. Upon information and belief, in 2008, the first mobile application stores were opened online.

## THE PARTIES

15. MFA is a Utah limited liability company with its principal place of business in Salt Lake City, Utah. MFA is the exclusive licensee of the patent in suit and continues to hold all substantial rights, including the right to sue for infringement and to collect all damages (including past damages) for infringement of the patent in suit.

16. On information and belief, Defendant is organized and registered in the State of Delaware. On information and belief, Defendant's registered agent and address for service of process is Corporate Creations Network Inc., 2825 East Cottonwood Parkway #500, Salt Lake City, UT 84121.

17. On information and belief, Defendant operates one or more regular and established place(s) of business in this state and this judicial district. For example, on information and belief, Defendant operates stores located at 389 West 1830 S, Salt Lake City and 3191 E 3300 S, Salt Lake City, as well as additional stores in at least the following Utah cities: Salt Lake City;

Murray; Taylorsville; West Jordan; Centerville; Sandy; and Riverton.

18. A photograph of the exterior of Defendant's store at 389 W 1830 S, Salt Lake City, UT 84115 is attached hereto as Exhibit B. This store displays Defendant's "PETSMART" name on the exterior and is listed on Defendant's website as one of Defendant's regular and established places of business in Utah.

19. Defendant makes, sells, offers for sale, uses, and/or imports one or more products and or systems, including mobile applications, that infringe at least one claim of the patent in suit, as further alleged herein.

20. Upon information and belief, the accused products, systems, and methods are used and/or made in the state of Utah and in this judicial district by Defendant (at least through its employees in Utah stores) and/or others (including, for example, Defendant's customers) induced by Defendant to use and/or make such products, systems and methods.

## JURISDICTION AND VENUE

21. MFA incorporates by reference paragraphs 1 through 20 above.

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1338(a) because this action arises under the patent laws of the United States of America, i.e., Title 35 of the United States Code.

23. Venue is proper in this judicial district pursuant to 28 U.S.C. §1400(b).

## THE ASSERTED PATENT

24. The '421 patent claims improvements in the field of computer technology, including improvements in technology for the delivery and use of non-standard or external fonts within a network system, as set forth in the '421 patent and further demonstrated in the following

paragraphs.

25. At the time that Mr. Adamson filed the priority application in 2001, the claimed elements and claimed combinations in the ‘421 patent were not well-understood, routine, or conventional to a skilled artisan in the relevant field. The claims of the patent in suit cover patent eligible subject matter, are not directed to an abstract idea, and contain inventive concepts sufficient to transform any abstract idea into a patent-eligible application, as set forth in the ‘421 patent and further demonstrated in the following paragraphs.

26. As set forth in the ‘421 patent, “electronic documents requested by a reader are displayed on the reader's computer using only the fonts that are currently loaded on the reader's computer. Accordingly, if the reader's computer does not contain the same fonts that were used by the author in creating the electronic document, the electronic document is displayed on the reader's computer in a form different than that originally created by the author. Generally, the operating system of the reader's computer replaces the unknown fonts with known fonts when displaying the electronic document.”

27. As set forth in the ‘421 patent, “Several attempts have been made to ensure that electronic documents made with non-standard fonts are displayed on a reader's computer in the same form, i.e., same font(s), as created by the author. One commonly used method is to represent the text as images in a digital format, such as bitmaps or jpeg files. These digital images, however, cannot be resized without a loss of quality. For example, if a digital picture of a text character is enlarged, the resolution of the text character is also enlarged, thereby degrading the visual appearance of the character both on the screen and in print.”

28. As set forth in the ‘421 patent, “characters represented as image files are typically much larger than characters represented by fonts. Accordingly, using an image file increases the size of the electronic document, thereby increasing its download time. In addition, image files take

longer to display on a screen. Thus, operations such as scrolling that require an image to be frequently rendered are slowed down and otherwise degraded. Finally, characters represented as image files cannot be stylized. For example, such characters cannot be italicized."

29. As set forth in the '421 patent, "In another attempted solution, a first computer includes a document builder that receives input text so that the input text may be represented in the document. The input text is originally defined using pre-defined font descriptions. The document builder then creates a new font description (hereinafter called a "proprietary vector font description") for the input text with the aid of a character shape recorder. The proprietary vector font description is then placed in the document. The first computer system then delivers the document to a second computer system. The second computer system includes a character shape player which is uniquely configured to interpret the proprietary vector font descriptions included in the document. If the second computer system does not already have the character shape player, the character shape player may be downloaded with the document."

30. As set forth in the '421 patent, "the proprietary vector font description is not standard to a reader's operating system. Accordingly, this solution requires the use of the character shape player by every reader's computer that is to display an electronic document containing the proprietary vector font. Many applications may not be configured to access the services of the character shape player. Accordingly, this solution does not allow the fonts represented by the proprietary vector font description to be freely copied and pasted into or otherwise used, such as by printing, by other applications that do not access the services of the character shape player. In addition, even if an application had access to the object player mechanism, the fonts cannot be rendered as efficiently as they could if the operating system itself was capable of interpreting the fonts. Accordingly, operations such as scrolling of the fonts is sluggish."

31. As set forth in the '421 patent, "what are desired are methods, systems, and computer

program products for allowing characters of fonts that are not standard to an operating system of a reader's computer to be conveniently used by the operating system to facilitate viewing, copying, pasting, printing, and/or editing of the characters in different applications."

32. As set forth in the '421 patent, "The computer automatically executes the installation software which in turn either permanently installs or temporarily exposes the computer readable formatting information to the operating system so as to enable the operating system to render the characters of the non-standard fonts. As a result, the network document is generated and displayed by the computer using the same characters with which it was originally created."

33. As set forth in the '421 patent, "in one embodiment the installation or exposure of the computer readable formatting information is done in a manner that the operating system of the computer has at least temporary access to utilize the characters of the nonstandard fonts. That is, the operating system is able to use the characters of the nonstandard fonts in the same way that it uses characters of original standard fonts. The operating system is thus able to efficiently copy, paste, print, modify, and otherwise edit the characters of the non-standard fonts."

34. As set forth in the '421 patent, "one of the problems of the prior art is that an increasing number of electronic documents are being created using unique characters wherein corresponding formatting information is not loaded on or otherwise available to a browsing computer, i.e., non-standard characters. Accordingly, when a browsing computer downloads the electronic document over a network or otherwise receives and opens the electronic document, the electronic document is displayed on the browsing computer without the non-standard characters or by replacing the non-standard characters with other characters that are available to the browsing computer. In any event, the electronic document is displayed in a format different from that intended at its creation."

35. As set forth in the '421 patent, "One of the unique benefits of the present invention is that

once font files 312 are enabled on browsing computer 204, the characters within font files 312 can be used the same as any of the font characters originally loaded on browsing computer 204. For example, the characters of font files 312 can be cut, pasted, printed and otherwise handled or manipulated, i.e., underlined, italicized, bolded, etc., just the same as originally loaded font characters. In turn, this increases efficient inter-application functionality. For example, the characters of font files 312 can also be copied and pasted to any other application being control by operating system 505, for example, applications 510a or 510b as depicted in FIG. 6."

36. As set forth in the '421 patent, "the principles of the present invention allow the operating system of a browsing computer access to non-standard characters when the browsing computer either retrieves off of the Internet or otherwise opens a network document or application that uses the non-standard characters. This allows the author of the electronic document or application to feel secure that no matter how unique the characters chosen to convey a message, the characters will be rendered on the browsing computer as the author intended. In addition, in one embodiment, the operating system can now use the nonstandard characters for copying and pasting across applications, as well as any other editing or printing that is enabled by the operating system, thus enhancing the functionality to the end user."

37. Pursuant to Rule 11(b)(3), upon information and belief, the factual contentions -- that the asserted claims cover improvements in the field of computer technology, are not directed to an abstract idea, and that the claimed elements and claimed combinations in the '421 patent were not well-understood, routine or conventional to a skilled artisan in the relevant field and contain an inventive concept sufficient to transform any abstract idea into a patent-eligible application -- will likely have additional evidentiary support after a reasonable opportunity for further

investigation or discovery.

## FIRST CLAIM FOR RELIEF

(Infringement of U.S. Patent No. 9,886,421)
(Against Defendant)

38. MFA incorporates by reference paragraphs 1 through 37 above.

39. On February 6, 2018, the '421 patent was duly and legally issued for an invention entitled: "Allowing Operating System Access to Non-Standard Fonts in a Network Document."

40. Since at least June 2018, substantially all the licensed patent articles have been marked in accordance with 35 U.S.C. §287, thereby putting Defendant and the public on notice of the '421 patent.

41. As described more fully in the incorporated disclosure of the '421 patent, the inventions of the '421 patent are improvements over prior art and subsequent patentably distinct means and methods of font delivery, and the '421 patent enables a combination of features not present in the prior art or other non-infringing means and methods.

42. Defendant has directly infringed and continues to directly infringe at least claims 1 and 11, and upon information and belief claim 6, and dependent claims of the '421 patent through making, using, selling, offering for sale, and/or importing of Defendant's products and services including, but not limited to Defendant's PetSmart, Inc. application for iOS devices, including at least version number 3.3.0, released on August 14, 2019, and Defendant's PetSmart application for Android devices, including at least version number 3.2.5, released on August 14, 2019 (the "Accused Product(s)").

43. Defendant provides the Accused Product(s) via a storage device attached to a computer, which is a non-transitory computer-readable medium adapted for use with a computer. Within the storage device, Defendant provides the iOS application in a computer-readable file and the

Android application in a computer-readable file.

44. Defendant's Accused Product(s) provide an electronic file package including a plurality of display characters and computer executable instructions for identifying the plurality of display characters for display and for identifying one or more external fonts used to render at least one of the plurality of display characters. The Android application file's root directory contains at least one file package. This includes, for example, .xml and/or .arsc files. These files include (a) characters to be displayed when the Android application is used, (b) computer executable instructions for identifying characters to be displayed, and (c) computer executable instructions for identifying external fonts used to render the characters. Within the iOS application file, Defendant provides at least one file package, for example, the executable file in a directory within the /Payload/ directory. Defendant also provides .nib files and .strings files. These files include (a) characters to be displayed when the iOS application is used, (b) computer executable instructions for identifying characters to be displayed, and (c) computer executable instructions for identifying external fonts used to render the characters.

45. Defendant's Accused Product(s) provide a font package comprising one or more external font files that include formatting information necessary for the hand-held device to render the at least one of the plurality of display characters using the one or more identified external fonts. Within the Android application file, Defendant provides font packages in a directory named /assets/font/. Each of the font packages comprises an external font file. Within the iOS application file, Defendant provides font packages in a subdirectory of the /Payload/ directory. Each of the font packages comprises an external font file.

46. Defendant's Accused Product(s) provide the font package separate from the computer executable instructions for identifying the plurality of display characters for display. Within the Android application file, the font package is a file in the /assets/ directory, whereas the computer

executable instructions are in, for example, the root directory. They are separate files. Within the iOS application file, the font package includes a .ttf file, whereas the computer executable instructions are in an executable file without any extension or in the .nib or .strings files. They are separate files.

47. Defendant's Accused Product(s) provide an exposure module for installation of the one or more external font files in a temporary fonts directory on the hand-held device. In the Android application, the exposure module is a file with a .apk extension that contains the /assets/ directory. The temporary fonts directory is the /assets/ directory, which is deleted whenever the Android application is updated or whenever the Android application is removed from a device. The .apk file ensures that the external font files are placed in the proper temporary fonts directory when installed on a handheld device. In the iOS application, the exposure module is a file with a .ipa extension that contains the /Payload/ directory and at least one sub-directory. The temporary fonts directory is a sub-directory of the /Payload/ directory, which is deleted whenever the iOS application is updated or whenever the iOS application is removed from a device. The .ipa file ensures that the external font files are placed in the proper temporary fonts directory when installed on a handheld device.

48. Defendant's Accused Product(s) provide the one or more external font files being received from the computer responsive to the computer receiving a request for the font package from the hand-held device so that the hand-held device can render the at least one of the plurality of display characters using the one or more external font files. For the Accused Product(s), the external font files identified above are received from an application store server (e.g., the Google Play store or iTunes store servers) responsive to that server receiving a request for the font package and the remainder of the application. That request is sent by the handheld device. The request is sent so that the handheld device can install and use the application, so that the

handheld device can render the display characters using the font files.

49. Defendant's Accused Product(s) provide that when the plurality of display characters are displayed, the plurality of display characters are displayed by a program module of the operating system using the one or more external font files. In the Accused Product(s), when the display characters are displayed, they are displayed by a program module of the operating system using the one or more external font files in the .apk or .ipa.

50. Defendant's Accused Product(s) provide that in response to the one or more external font files being installed, a system font table of the hand-held device is updated to reflect an availability of the external font files. After the application is installed and prior to rendering of the display characters, a system font table present in the operating system is updated to reflect that the external font files are available for use when executing the application. For example, in the iOS App, Defendant provides a font listing in the Info.plist file using the UIAppFonts key. The iOS system loads the fonts specified by this key and makes them available for use by the iOS application. For example, in the Android application, inclusion of the external font file in the /assets/ directory causes the operating system to load the fonts and make them available for use.

51. In addition to the elements identified above, the Accused Product(s) (and/or use of the Accused Product(s)) include the elements of at least claims 3, 4, 6, 7, 8, 9, 10, 11, and 13 of the '421 patent.

52. Defendant has made and/or had made the Accused Products and downloaded and/or had downloaded the Accused Products onto hand-held devices.

53. On information and belief, Defendant has instructed and continues to instruct employees to download the Accused Products onto hand-held devices so that employees can use the Accused Products in the course of their employment and so that employees can assist

Defendant's customer's use and show Defendant's customers how to use the Accused Products.

54. Defendant has directly infringed the '421 patent in the State of Utah among other locations, including, for example, through the employees of its Utah stores by making, using, and/or importing the Accused Products, as set forth herein.

55. For example, at least two employees of Defendant's store in Taylorsville, Utah, have downloaded the Accused Products, thereby directly infringing the '421 patent in Utah in their work duties as Defendant's employees.

56. Also, at least one employee of Defendant's store in Centerville, Utah, has downloaded and used the Accused Products, thereby directly infringing the '421 patent in Utah in his work duties as Defendant's employee. Said employee both uses the Accused Products and demonstrates the Accused Products to customers.

57. Said employee in Defendant's Centerville, Utah store has knowledge and information relating to PetSmart and the Accused Product(s), and is located in Utah.

58. Defendant's employees in Defendant's Taylorsville, Utah store have knowledge and information relating to PetSmart and the Accused Product(s), and are located in Utah.

59. While performing his work duties on behalf of Defendant, Defendant's Centerville store employee uses computer hardware comprising at least his handheld device located in Utah in connection with the Accused Product(s).

60. While performing their work duties on behalf of Defendant, Defendant's employees in Defendant's Taylorsville store use computer hardware comprising at least their handheld devices located in Utah in connection with the Accused Product(s).

61. Upon information and belief, Defendant encourages its employees in its Utah stores to download and use the Accused Products and such employees do download and use the Accused Products, thereby directly infringing the '421 patent in their work duties as Defendant's

employees.

62. For example, Defendant's downloading and use of the Accused Products in Defendant's Centerville, Utah and Taylorsville, Utah stores constitutes direct infringement of at least claim 11 of the '421 patent by at least making and using a patented invention during the term of the '421 patent, under 35 U.S.C. §271(a).

63. Claim 11 of the '421 patent is directed to a "hand-held device." The smart phone devices used by Defendant's Centerville and Taylorsville employees are hand held devices.

64. Claim 11 of the '421 patent includes "a display," "a processing unit," and "memory to store instructions…" The hand held devices identified in the preceding paragraph included a display, also referred to as a screen or an LCD. Upon information and belief, every hand held device operating on iOS includes an LCD screen. Upon information and belief, every hand held device operating on Android OS includes an LCD screen. The hand held devices identified in the preceding paragraph also included a processing unit in the form of a microprocessor. Upon information and belief, hand held devices operating on iOS include processors designated as one of A5, A6, A7, A8, A9, A10, A11, A12, or A13. Upon information and belief, hand held devices operating on Android OS use different processors depending on the manufacturer, but the ability to display information on the LCD screen indicates that a processor is present. Upon information and belief, every hand held device operating on iOS and Android OS includes memory to store instructions in the form of RAM memory and NAND memory. Such memory is where the Accused Products and the operating system are stored when downloaded to an iOS or Android OS hand held device.

65. Claim 11 of the '421 patent includes instructions that "enable communication between the hand-held device and the second computer coupled to the network…" Upon information and belief, all iOS and Android OS hand held devices include one or more of WiFi, cellular,

Bluetooth, and other communication hardware that is enabled to communicate with networks and networked computers by the instructions stored in the memory.

66. Claim 11 of the '421 patent notes that the instructions when executed download an electronic file. Upon information and belief, all iOS hand held devices are configured with instructions in memory to download electronic files from the Apple App Store. Upon information and belief, all Android OS hand held devices are configured with instructions in memory to download electronic files from the Google Play store.

67. Claim 11 of the '421 patent states that the electronic file includes computer executable instructions for identifying two or more display characters for use in a program application and for identifying a font used to render at least one display character of the two or more display characters for use in the program application. Defendant's Accused Product(s) provide an electronic file that includes these features. The Android application file's root directory contains at least one file. This includes, for example, .xml and/or .arsc files. These files include (a) characters to be displayed when the Android application is used, (b) computer executable instructions for identifying characters to be displayed, and (c) computer executable instructions for identifying fonts used to render the characters. Within the iOS application file, Defendant provides at least one file, for example, the executable file in a directory within the /Payload/ directory. Defendant also provides .nib files and .strings files. These files include (a) characters to be displayed when the iOS application is used, (b) computer executable instructions for identifying characters to be displayed, and (c) computer executable instructions for identifying fonts used to render the characters.

68. Claim 11 of the '421 patent states that the computer executable instructions reference a font package comprising computer readable formatting information necessary for an operating system of the hand-held device to render the at least one display character on the display using

the font. Defendant's Accused Product(s) provide these features. Within the Android application file, Defendant provides font packages in a directory named /assets/font/. Each of the font packages comprises an external font file. Within the iOS application file, Defendant provides font packages in a subdirectory of the /Payload/ directory. Each of the font packages comprises a font file and the computer executable instructions reference these font packages.

69. Claim 11 of the '421 patent states install an exposure module on the hand-held device the exposure module for automatically installing or exposing the font package to the hand-held device so that the hand-held device can render the at least one display character using the font. Defendant's Accused Product(s) provide these features. In the Android application, the exposure module is a file with a .apk extension that contains the /assets/ directory. In the iOS application, the exposure module is a file with a .ipa extension that contains the /Payload/ directory and at least one sub-directory. The instructions on the memory cause the exposure module to be installed on the hand held device when Defendant's Accused Products are downloaded to the hand held device.

70. Claim 11 of the '421 patent states cause the exposure module to install at least a portion of the font package to a temporary fonts directory of the hand-held device so that a program module of the hand-held device can render the at least one display character using the font, whereby when the at least one display character is displayed, the at least one display character is displayed using the font. Defendant's Accused Product(s) provide these features. In the Android application, the temporary fonts directory is the /assets/ directory, which is deleted whenever the Android application is updated or whenever the Android application is removed from a device. The .apk file ensures that the external font files are placed in the proper temporary fonts directory when installed on a handheld device. In the iOS application, the temporary fonts directory is a sub-directory of the /Payload/ directory, which is deleted whenever the iOS

application is updated or whenever the iOS application is removed from a device. The .ipa file ensures that the external font files are placed in the proper temporary fonts directory when installed on a handheld device. Use of Defendant's Accused Product(s) on an iOS or Android OS hand held device demonstrates the presence of instructions that permit a program module of the hand held device to render and display the display characters using the font.

71. Claim 11 of the '421 patent states cause a system font table of the hand-held device to be updated to reflect an availability of the font. Defendant's Accused Product(s) provide these features. For example, in the iOS App, Defendant provides a font listing in the Info.plist file using the UIAppFonts key. The iOS system updates a system font table using the information specified by this key to reflect that the fonts are available for use by the iOS application. For example, in the Android application, inclusion of the external font file in the /assets/ directory causes the operating system to update a system font table and make the fonts available for use.

72. Thus, by way of example, each of the features of claim 11 of the '421 patent is present in the hand held devices of Defendant's employees in the Taylorsville, Utah and Centerville, Utah stores. Defendant directly infringes, for example, claim 11 of the '421 patent, at least by making and using the claimed hand held devices by downloading Defendant's Accused Product(s) onto these hand held devices and by using Defendant's Accused Product(s) on these hand held devices.

73. Pursuant to Rule 11(b)(3), the factual contentions regarding Defendant's Accused Products are likely to have further evidentiary support after a reasonable opportunity for further investigation or discovery.

74. Defendant has actively induced and continues to actively induce others to infringe the '421 patent. Defendant's advertisements and marketing materials, including but not limited to internet websites, advertisements, and Defendant's product listing(s) in online application stores

accessible to the public encourage customers to infringe the '421 patent through making, using, selling, offering for sale, and/or importing of products, services, and methods incorporating the Accused Product(s). As of the filing date of this complaint, Defendant's internet websites and advertisements have remained available and have continued to encourage customers to infringe the '421 patent. For example, the webpages at https://www.petsmart.com/store-locator/store/?storeID=0172 and https://www.petsmart.com/mobile-app-landing-page/mobile-app.html?dec=download-app&origin=landingpage&type=section2 encourage customers to use Defendant's Accused Product(s) and/or make products in an infringing manner.

75. As of the date of this amended complaint, Defendant continues to actively induce others in Utah and other states to infringe the '421 patent through Defendant's product listings in online application stores that encourage customers to infringe the '421 patent through making, using, selling, offering for sale, and/or importing of products, services, and methods incorporating the Accused Product(s). These product listings include listings found at https://play.google.com/store/apps/details?id=com.petsmart.consumermobile&hl=en_US and https://apps.apple.com/us/app/petsmart-inc/id1175467091. These listings demonstrate specific intent to induce infringement by demonstrating that Defendant specifically intends its customers to download and use the Accused Instrumentalities, both acts of infringement of the '421 patent.

76. As of the date of this amended complaint, Defendant continues to actively induce others in Utah and other states to infringe the '421 patent through Defendant's internet websites and advertisements that encourage customers to infringe the '421 patent through making, using, selling, offering for sale, and/or importing of products, services, and methods incorporating the Accused Product(s). These internet websites include webpages found at https://www.petsmart.com/stores/us/ut/salt-lake-city-store0172.html. These listings demonstrate specific intent to induce infringement by customers in Utah, demonstrating that Defendant

specifically intends its customers to download and use the Accused Instrumentalities, both acts of infringement of the '421 patent. These internet websites include directions to "Download the FREE PetSmart mobile app today & access your digital card, book services, get special offers & manage your account", "Download on the App Store", and "GET IT ON Google Play", along with links to both the referenced App Store and Google Play.

77. As of the date of this amended complaint, Defendant continues to actively induce others in Utah and other states to infringe the '421 patent through Defendant's internet websites and advertisements that encourage customers to infringe the '421 patent through making, using, selling, offering for sale, and/or importing of products, services, and methods incorporating the Accused Product(s). These internet websites include webpages found at https://www.petsmart.com/mobile-app-landing-page/mobile-app.html?dec=download-app&origin=landingpage&type=section2. These listings demonstrate specific intent to induce infringement by customers in Utah, demonstrating that Defendant specifically intends its customers to download and use the Accused Instrumentalities, both acts of infringement of the '421 patent. These internet websites include directions to "Get the FREE PetSmart App! Download at the app store or through Google Play", "Download on the App Store", "GET IT ON Google Play", and "Download the FREE PetSmart mobile app today & access your digital card, book services, get special offers & manage your account", along with links to both the referenced App Store and Google Play. It further includes directions to use the Accused Instrumentalities to "Get customized coupons, articles, checklists & more based on your pet profiles", "Schedule grooming appointments, get reminders, plus check camp playtimes & more", "Sign up for our loyalty program & keep track of your points & exclusive deals", "Add every member of your family to your account including fish, reptiles & furry friends!", "Collect treats & earn points to receive valuable coupons in this fun interactive game!", and "Buy your

pet essentials anytime with our faster, easier shopping experience through our mobile app."

78. In the Utah store shown on Exhibit B, Defendant has induced and, upon information and belief, continues to induce Utah customers to infringe the '421 patent by providing customers with the paper brochure shown in Exhibit C. This brochure was made available to Utah customers in December 2019 and, upon information and belief, was made available to Utah customers at all times since at least January 2019, based upon the statement on the brochure to "Display thru 01/27/2019." This brochure induces infringement by encouraging Utah customers to download and use the Accused Instrumentalities through the instructions, "Plus, get extra points by completing your profile at petsmart.com/treats or on our FREE mobile app." This brochure demonstrates specific intent to induce infringement by customers in Utah, demonstrating that Defendant specifically intends its customers to download and use the Accused Instrumentalities, both acts of infringement of the '421 patent.

79. In the Utah store shown on Exhibit B, Defendant has induced and, upon information and belief, continues to induce Utah customers to infringe the '421 patent by providing customers with the paper brochure shown in Exhibit D. This brochure was made available to Utah customers in December 2019 and, upon information and belief, was made available to Utah customers at times prior to and since then. This brochure induces infringement by encouraging Utah customers to download and use the Accused Instrumentalities through the instructions, "download our PetSmart app." This brochure demonstrates specific intent to induce infringement by customers in Utah, demonstrating that Defendant specifically intends its customers to download and use the Accused Instrumentalities, both acts of infringement of the '421 patent.

80. In the Utah store shown on Exhibit B, Defendant has induced and, upon information and belief, continues to induce Utah customers to infringe the '421 patent by providing customers

with the paper brochure shown in Exhibit E. This brochure was made available to Utah customers in December 2019 in a plastic display case near the checkout register and as copies at the checkout station for customers to take and, upon information and belief, was made available to Utah customers at times prior to then. This brochure induces infringement by encouraging Utah customers to download and use, in Utah, the Accused Instrumentalities through the instructions, "Bring the whole family in for FREE photos with Santa! Download the PetSmart app to use fun photo filters during the event." This brochure demonstrates specific intent to induce infringement by customers in Utah, demonstrating that Defendant specifically intends its customers to download and use the Accused Instrumentalities, both acts of infringement of the '421 patent.

81. In the Utah store shown on Exhibit B, Defendant has induced and, upon information and belief, continues to induce Utah customers to infringe the '421 patent by showing customers of the store the advertisement shown in Exhibit F. This advertisement was made available to Utah customers at the checkout register in December 2019 and, upon information and belief, was made available to Utah customers at times prior to and since then. This advertisement induces infringement by encouraging Utah customers to download and use, in Utah, the Accused Instrumentalities through the instructions, "Download our FREE mobile app & access everything you need for your pet", "Download on the App Store", and "GET IT ON Google Play." This advertisement demonstrates specific intent to induce infringement by customers in Utah, demonstrating that Defendant specifically intends its customers to download and use the Accused Instrumentalities, both acts of infringement of the '421 patent.

82. Defendant's acts of inducing infringement in Utah include directing emails that induce infringement to customers known to have addresses in Utah. The email shown in Exhibit G and similar emails are and were sent to Defendant's customers who sign(ed) up for Defendant's

rewards program called “treats”. The emails are sent after the customer provides an address to Defendant. The exemplary email shown in Exhibit G was sent after a Utah address was provided as part of the sign up procedure for a “treats” reward account on December 9, 2019. Upon information and belief, such emails have been sent to Utah customers both prior to and after December 9, 2019. This email induces infringement by encouraging Utah customers to download and use the Accused Instrumentalities through the instructions, “Download the FREE PetSmart mobile app to access your digital card, track your points, book pet services & more. Available for iPhone & Android”, “Download on the App Store”, “GET IT ON Google Play”, and “download the FREE PetSmart app.” This email confirms that it is an advertisement of Defendant directed into Utah by the statement, “This message was sent by PetSmart…” This email demonstrates specific intent to induce infringement by customers in Utah, demonstrating that Defendant specifically intends its customers to download and use the Accused Instrumentalities, both acts of infringement of the ‘421 patent.

83. Defendant has induced and, upon information and belief, continues to induce customers to infringe the ‘421 patent by providing its customers with the brochure shown in Exhibit H. This advertisement was made available to customers in June 2020 and, upon information and belief, was made available to customers since at least February 2017, based upon the statement “Display thru 02/26/2017” on the brochure. This brochure induces infringement by encouraging customers to download and use the Accused Instrumentalities through the instructions, “get the FREE PetSmart app”, “book your next appointment in a snap with our app!”, “Download on the App Store”, “GET IT ON Google Play”, and “Available at the App Store or Google Play. *Text APP to 84848 to  get a link to download the app now.” This advertisement demonstrates specific intent to induce infringement by customers, demonstrating that Defendant specifically intends its customers to download and use the Accused Instrumentalities, both acts of infringement of the

‘421 patent.

84. Based upon Exhibits C, D, E, and F, both paper and electronic documents related to the Accused Product(s) in the custody, possession, or control of Defendant are located in Utah. Upon information and belief, additional paper and electronic documents related to the Accused Product(s) are in Defendant’s possession in Utah.

85. Defendant has contributed to and continues to contribute to the infringement of the ‘421 patent. The identified products and services are especially made or especially adapted for use in practicing the patented inventions of the ‘421 patent in a manner that infringes the ‘421 patent, constitute a material part of the invention of the ‘421 patent, are not staple articles or commodities of commerce, and are not suitable for substantial non-infringing use. Each download of the identified products constitutes infringement. Because the infringing features of the identified products are actively used each time the identified products are used, there is no substantial way to use the identified products without infringing the ‘421 patent.

86. Upon information and belief, Defendant has provided the identified products and services to customers in Utah in a manner that constitutes contributory infringement as set forth in the preceding paragraph.

87. Defendant’s infringement of the ‘421 patent has caused and continues to cause damage to MFA in an amount to be determined at trial.

88. Defendant’s infringement as herein alleged will continue to cause immediate and irreparable harm to MFA for which there is no adequate remedy at law, unless this Court enjoins and restrains such activities.

89. Defendant is liable to MFA for infringement of the ‘421 patent pursuant to 35 U.S.C. §271.

## PRAYER FOR RELIEF

WHEREFORE, MFA prays for the following relief:

1. That judgment be entered in favor of MFA that the accused Defendant infringed directly, infringed through inducement, and contributed to infringement and continues to infringe the '421 patent in violation of 35 U.S.C. §271;

2. That MFA be granted an accounting of all damages sustained because of Defendant's infringement of MFA's patent;

3. That MFA be awarded actual damages with prejudgment interest according to proof, and enhanced damages pursuant to 35 U.S.C. § 284 and as provided by law;

4. That a permanent injunction be issued pursuant to 35 U.S.C. §283 enjoining Defendant, its officers, agents, servants, employees and all other persons acting in concert or participation with them from further infringement of MFA's patent, or if a permanent injunction is denied, issuance of an ongoing royalty under 35 U.S.C. §283 or such other authority as may support such ongoing royalty;

5. That this case be decreed an "exceptional case" within the meaning of 35 U.S.C. §285, and that reasonable attorneys' fees, expenses, and costs be awarded to MFA; and

6. That MFA be awarded such further relief as the Court deems just and proper.

## JURY DEMAND

MFA hereby demands a jury trial as to all issues triable to a jury.

Dated: July 9, 2020

Respectfully submitted,

By: */s/ Perry S. Clegg*

Perry S. Clegg (USB 7831)
pclegg@kba.law
**KUNZLER BEAN & ADAMSON, PC**
50 W. Broadway, Suite 1000
Salt Lake City, UT 84101
Tel.: (801) 994-4646
Fax: (801) 758-7436

*Attorneys for Plaintiff,*
Modern Font Applications LLC

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2020 I electronically filed the foregoing and attached documents with the clerk of the court for the U.S. District Court for the District of Utah, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of the document(s) by electronic means.

*/s/ Perry S. Clegg*
Perry S. Clegg